## Wanamaker's Estate.

*Transfer inheritance tax—Transfer inter vivos in contemplation of death —Special and general contemplation distinguished—Act of June 20, 1919.*

1. The title of the Transfer Inheritance Tax Act of June 20, 1919, P. L. 521, "providing for the imposition and collection of certain taxes upon the transfer of property passing from a decedent," etc., limits the act to property passing from a decedent at the time of his death, and the body of the act may not be broader. Hence, assuming the gift to be absolute and not made with death impending, the question of age has no bearing on the taxability of the gift. The fact that the gifts upon which the Commonwealth claims tax amount to a final disposition of the bulk of decedent's estate does not subject them to the tax.

2. The language of section 1 (c) of the act, under which the tax is imposed "when the transfer is of property made by a resident by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor," is to be construed as limited to those cases in which the transfer is made in special, as distinguished from general, contemplation of death; there is a distinction between a gift *inter vivos* made in contemplation of death at some distant, though uncertain, time and its contemplation after one has. been "pinched by the messengers of death" and may fairly be taken to have regarded it as impending immediately or at no distant time, as where a man is suffering from a mortal disease and knows of his own condition.

*Transfer inheritance tax—Appeals from appraisement—Right to an issue to the Common Pleas in tax appeals—Acts of June 7, 1917, and June 20, 1919.*

3. Tax appeals to the Orphans' Court are not governed by section 21 (b) of the Act of June 7, 1917, P. L. 363, because they are not appeals from any action of the register of wills, but from an appraisement made by an appraiser who is the agent of the Commonwealth. The right to such appeals is given and they are regulated by section 13 of the Act of June 20, 1919, P. L. 521.

4. There is no statute on practice warranting the award of an issue as of right in tax appeals.

Exceptions to adjudication. O. C. Phila. Co., Oct. T., 1924, No. 3792.

This was an appeal from the order of the Register of Wills sustaining an appraisement of common stock in the corporation known as John Wanamaker Philadelphia, given by John Wanamaker to Rodman Wanamaker, his son, the appraisement of such common stock being $30,000,000; also of certain preferred stock in the same corporation to his daughters, amounting to $1,000,000. The ground upon which the gifts were taxed was that they were made in contemplation of death, and, therefore, void as against the Commonwealth under section 1 (c) of the Act of June 20, 1919, P. L. 521. At the time of making the gifts, the decedent was 82 years old, the date being Dec. 14, 1920; he died Dec. 12, 1922, from bronchial pneumonia contracted in September of the same year. It appears from the adjudication of GEST, J., presiding, that at the time of the gift, the decedent was in active business; in addition to the constant oversight and financial management of his enormous business in Philadelphia and New York, he was President of the First Penny Savings Bank; Superintendent of Bethany Sunday School; and actively engaged in many church activities, "which made Sunday anything but a day of rest." He was also Chairman of the Finance Committee of the Board of Education, and interested in the Pennsylvania Military College and in Williamson School. In all these enterprises he was a leader, and his leadership in public affairs was well known and recognized in Philadelphia.

Medical testimony showed that at 82 years of age, his arteries were normal; blood pressure was normal; his lungs, while somewhat fibroid through repeated bronchial colds, functioned all right; his kidneys functioned perfectly. He had, however, certain other difficulties which are thus described:

Wanamaker's Estate.

"There were, however, two features of his physical condition upon which great stress was laid by the Commonwealth. The first was this: for about twelve years prior to Wanamaker's death, and, consequently, for about ten years prior to the transfer of this stock in 1920, he had an enlarged prostate gland, typical of a benign growth. To relieve this difficulty, the choice was presented of an operation or the use of a permanent, that is, as it was called, an indwelling catheter, and Wanamaker, after consultation with his physicians (see pp. 305, 307, 308 and 320b, etc.) and also Dr. Pelouse, the genito-urinary specialist (testimony 335b), deliberately selected the latter course, which enabled him to relieve his bladder whenever he desired, and he continued this catheter life until the end. The catheter so used, however, required attention, and every four or five days his physician removed it, washed out the bladder and inserted a clean catheter, but, according to the testimony of Dr. Quicksall (325b), this had not the slightest effect on Wanamaker's health and had nothing to do with bringing on the illness from which he died.

"At this point, it may be convenient to refer to the testimony of Dr. Hiram R. Loux (356b, et seq.) and the offer of the testimony of Dr. Robert Boyer (361b), who, it was agreed, would corroborate Dr. Loux. These physicians were specialists in genito-urinary diseases and were called to prove the duration of life of a man living an indwelling catheter life. The testimony was to the effect that a man 81 to 83 years, leading such a life, would have an expectation of life of two to five years, and that an operation is always advised in such cases of normal subjects, as life would be thereby prolonged. The testimony was admitted, under objection, the court stating at the time that he thought it was inadmissible. On consideration I adhere to that opinion and strike it out. The argument of the Commonwealth was that it was reasonable to suppose that 'John Wanamaker was advised as to the medical opinion of these men as to the condition he was in.' But the testimony of Dr. Pelouse was distinctly that, in his opinion, John Wanamaker was getting along so well that there was no reason to believe he would not continue to do so without an operation, and Dr. Pelouse added (335b), 'I thought nobody would advise any operative treatment.' I cannot see, therefore, that this testimony of other physicians, who never saw the patient, that they would have treated the case differently, has the slightest bearing on the case. After all, the question is whether Wanamager himself thought, or had reason to think, that his life would be curtailed by his prostatic condition and his physician's treatment of him for its relief, and his knowledge or belief is clearly in no way dependent upon what some other doctor might have advised if he had been the consultant.

"During the examination of the medical witnesses, the Commonwealth inquired closely into the muco-pus secretion which was wont to accumulate while the catheter was in position, and a slight irritation or inflammation of the bladder, incident thereto, to remedy which the bladder was washed out when a fresh catheter was placed in position. It was argued that this gave rise to a septic condition and indicated the existence of organic disease. An organ is any part of a body having a special function, and, of course, a disease of the prostate gland is, in a sense, an organic disease; but the medical testimony was clear that Wanamaker's last illness and death was in no degree attributable to this cause. His organs, in the proper meaning of the word, that is, his vital organs, were and always had been in sound condition.

"The Commonwealth also laid stress on the fact that Dr. Quicksall, in his official certificate (553b) of Wanamaker's death, after giving the cause of

death as 'Acute Bronchial Infection, Chronic Bronchitis, two months and twenty days' duration,' stated, as contributory or secondary cause, 'Myocarditis of two years' duration.' It was argued that this myocarditis might have originated from some infection arising from Wanamaker's bladder condition, but Dr. Quicksall explained (312b) that while the word myocarditis means, in general, inflammation of the heart muscle, or a degenerative change of it, in Wanamaker's case it was rather a natural change, due to advancing age, which occurs in practically every man as soon as he reaches the age of sixty (testimony 309b), and that the occasional drop of a heart-beat amounted to nothing. And during the time Dr. Quicksall observed the decedent, the latter was extremely active in business, not only in Philadelphia, but going to New York once a week on the 7 o'clock train, and not getting home until 7 o'clock at night (312b). His digestion was remarkable and only once did Dr. Quicksall have occasion to treat him for indigestion (313b)."

The Presiding Judge arrived at the conclusion that the intimate personal relations existing between John Wanamaker and Rodman Wanamaker made the gift entirely natural, and there was no reason to believe that the gift in itself could create any presumption of an attempt to defraud the Commonwealth.

In regard to the preferred stock, the Presiding Judge uses the following language:

"The preferred stock was thus issued and delivered to the Fidelity Trust Company, in whose possession it has since remained. The first dividend was received by the trustee Dec. 11, 1923, and since that date semi-annual dividends have been received by the trustee.

"The Commonwealth argued that the dividends being deferred until after the death of John Wanamaker and he being, when the preferred stock was authorized, the owner of the common stock of John Wanamaker Philadelphia, the gift was not completed in his lifetime. But the creation and issuance of the preferred stock was an integral part of the same transaction by which all the common stock was transferred to Rodman Wanamaker. It was the latter, not John Wanamaker, who benefited by the postponement of dividends on the preferred stock, and the transaction was virtually one in which the whole business was transferred to Rodman Wanamaker, subject to the payment of an annual charge of $60,000 in favor of the daughters, beginning at a future time, and that this future time was to date from John Wanamaker's death is not, therefore, important."

The Presiding Judge then continues touching the construction of the Act of June 20, 1919:

"This tax is imposed under the authority of the Act of June 20, 1919, P. L. 521, 'Providing for the imposition and collection of certain taxes upon the transfer of property passing from a decedent who was a resident of this Commonwealth at the time of his death, and of property within this Commonwealth of a decedent who was a non-resident of the Commonwealth at the time of his death. . . .' In section 1 the tax is 'imposed upon the transfer of any property, real or personal, . . . to persons or corporations in the following cases:'

" '(a) When the transfer is by will or by the intestate laws of this Commonwealth from any person dying seized or possessed of the property while a resident of the Commonwealth. . . .

" '(c) When the transfer is of property made by a resident . . . by deed, grant, bargain, sale, or gift, made in contemplation of the death of the

grantor, vendor, or donor, or intended to take effect in possession or enjoyment at or after such death.'

"In Spangler's Estate, 281 Pa. 118, the Orphans' Court of Lancaster County held the act to be unconstitutional and the Supreme Court reversed the decree.

"In his analytical construction of the Act of 1919 Mr. Justice Simpson held, in the first place, that the constitutional operation of the act must be confined to cases where the property in question passes from a decedent at the time of his death, and that the meaning of the expression 'passing from a decedent at the time of his death' must be ascertained from the decisions of the court under the prior statute of May 6, 1887, which provided for the taxation of property 'passing from any person, who may die seized or possessed of such estate,' and, therefore, 'so much of the Act of 1919 as provides that the tax is to be imposed on transfers 'intended to take effect in possession or enjoyment at or after such death' must be held to be within the expression of the title.'

"The Supreme Court held that the same conclusion must be reached as to the words 'made in contemplation of the death of the grantor, vendor, or donor' in the Act of 1919, provided that the same are limited to gifts which do not take full effect before that time, and, by way of further explanation, added what is in the present case of great significance:

" 'It may not be unwise, although perhaps unnecessary, to add that a *bona fide* and unconditional transfer by deed or gift, which has been fully consummated by conveyance of the title, and absolute and exclusive possession of the property taken by the transferee, is not within the purview of the statute; nor is a *bona fide* and unconditional grant, bargain or sale, which has been thus fully consummated, or only awaits consummation in due course, without reference to the death or possible death of the grantor or bargainer; since neither is 'to take effect in possession or enjoyment at or after such death.' '

"It is said in the argument of the learned counsel for the Commonwealth that the remarks of the Supreme Court in Spangler's Estate, which have been quoted, were *obiter dicta* and not necessary to the discussion of the question decided by the court. But the present is not the case of some extra-judicial dictum, something said as an argument or illustration, and so, strictly *obiter*, or by the way, but was the deliberate opinion of the Supreme Court, not expressed guardedly, as was the dicta in Frants v. Brown, 17 S. & R. 287. These remarks were entirely pertinent to the case in hand, and evidently intended to settle the law and serve as a guide to the profession and the lower courts, and they must be regarded as such in this case. The subject of judicial dicta is fully considered in that excellent treatise Ram on the Science of Legal Judgment, ch. v, and in Black on Judicial Precedents, ch. II; but what has been here said is quite sufficient.

"The Act of 1919 provides in its title for the imposition of taxes upon 'the transfer of property passing from a decedent who was a resident of the Commonwealth at the time of his death, and of property within this Commonwealth of a decedent who was a non-resident of the Commonwealth at the time of his death,' and the Supreme Court has construed this title, by the use of brackets, as limiting the tax to property 'passing from a [resident] decedent at the time of his death' and 'property within the Commonwealth of a [non-resident] decedent at the time of his death,' and the opinion proceeds: 'It is clear from the title, therefore, that no one would expect to find in the body of the act a direction that any property should be taxed other than such as should pass from a 'decedent . . . at the time of his death.' The Com-

monwealth claims that this construction is erroneous and the words 'at the time of his death' should be read so as to qualify the noun 'resident,' instead of the verb 'passing,' the title meaning, as it is claimed, 'the transfer of property passing from a decedent who at the time of his death was a resident of this Commonwealth.'' I must presume that the Supreme Court gave careful consideration to the grammatical construction of the phrase in question and it is impossible for me to hold that this was error, even if I thought the difference more material than it seems to be.

"It will be observed that the Supreme Court uses the phrase 'a *bona fide* and unconditional transfer by deed or gift which has been fully consummated,' etc., and it might perhaps be argued that the *bona fides* mentioned refers only to the unconditional nature of the transfer, especially in view of the stress laid in the concluding words of the above extract from the opinion upon the time when the deed or gift takes effect in possession and enjoyment; that is to say, the word 'unconditional' is used as merely explanatory of the word '*bona fide*,' the copulative 'and' having its epexegetical sense. But, in my opinion, when the Supreme Court speaks of a *bona fide* transfer, they intend to exclude from the scope of this paragraph the cases of which Reish *v.* Com., 106 Pa. 521, and Seibert's Appeal, 110 Pa. 329, are examples, where the transfer was only made as a scheme or device to evade the tax and defraud the Commonwealth. In the present case I do not think it can be successfully contended that the transfer made by John Wanamaker of the stock in question was such a fraudulent scheme or device. This, indeed, was not urged by the Commonwealth which raised the questions as stated:

"1. Was the gift of said stock a completed gift *inter vivos?*

"2. Was the transfer of said stock made or intended to take effect in possession and enjoyment at and after the death of John Wanamaker, and

"3. Was the transfer of said stock made in contemplation of the death of John Wanamaker?

"In reference to the 3rd and last contention of the Commonwealth, it might be sufficient to say that Spangler's Estate restricted the application of the words 'made in contemplation of the death of the grantor, vendor or donor,' as found in the act of assembly, to cases of gifts which do not take full effect before the death of such grantor, and this construction would seem in effect to strike these words from the act. As, however, I may be mistaken in this opinion and in view of the argument made on this point by the counsel for the Commonwealth, it may be well to determine the legal meaning of the phrase 'in contemplation of death.'

"It is very clear that this contemplation of death is not the general knowledge of all men that all men must die, or the general expectation of every man that his life, like that of all others, must sooner or later terminate. The certainty of death is, and always has been, a common theme of poets and moralists, Pagan and Christian, from the earliest recorded times, and every man, as his years increase, knows that his future years are fewer. Such a general contemplation of death may often influence one's acts and purposes, but when we are dealing with a transfer or gift of property 'in contemplation of death,' we mean, first, that death is contemplated, not as an event which although certain to occur will only occur in the indefinite future, but as an event that is, in the circumstances, definitely imminent in the near future; and, second, that this contemplation of death exists as the impelling motive of the transfer or gift, which transfer is intended to be in lieu of a testamentary devise. It is one thing for a man to contemplate death in the dim distance before, as Sir Edward Coke would say, he is pinched with the

messengers of death, and a very different thing to find death, as we say, staring him in the face.

"No other statute containing these words has been construed by our Supreme Court, but the foregoing is in substantial accord with the decisions in other jurisdictions, among which may be cited Rea *v.* Heiner, 6 Fed. Repr. (2nd series) 389; Spreckels *v.* State, 30 Cal. App. 363; State *v.* Pabst, 139 Wis. 561; In re Baker, 83 App. Div., N. Y., 530; In re Cornell, 66 App. Div., N. Y., 162.

"The phrase 'contemplation of death' has also been construed in conformity with these views by the Orphans' Court of Warren County in Edwards's Estate, 1 D. & C. 497, where it was held that the facts of the case brought it within the legal meaning of the statute, the constitutionality of which was not questioned. The Commonwealth, indeed, cited this case as sustaining its contention, but the facts are radically different. The transfer was made during the last illness of the donor, and only seven weeks before his death, and four days after he was removed to a hospital in a condition of semi-delirium, when he was suffering from a disease of the kidneys, chronic diabetes and a general breakdown. In this situation he conveyed the subject of the gift to his attorney, who immediately re-conveyed it to the grantor and his wife, thus vesting in them an estate by the entireties, so that, on his death, she claimed the estate alone.

"The above construction of the phrase, in contemplation of death, is, furthermore, consistent with the analogous decision of our Supreme Court in a case of *donatio mortis causa,* where the phrase was considered to be synonymous with expectation or apprehension of death: Gourley *v.* Linsenbigler, 51 Pa. 345.

"That Wanamaker when he made this transfer of stock had no contemplation of death in the legal meaning of the phrase, but expected, on the contrary, to live for years, appears clearly from the testimony of Nevin (95*b*), Judge Beeber (114*b*) and former Mayor Moore (150*b*), that he was looking forward to taking an active part in the Sesqui-Centennial celebration now being held in this city, as he had in the Centennial Exposition of 1876. The testimony of these witnesses, together with that of Messrs. Paisley (175*b*), Embick (179*b*) and MacLennan (207*b*), shows that, up to the very last, Wanamaker continued and expected to continue all his varied activities without intermission.

"The above discussion of Spangler's Estate covers in great measure the principles of law applicable to the present case. It is expedient, however, to refer to other decisions cited in the argument.

"Reish *v.* Com., 106 Pa. 521, was decided under the original inheritance tax law of April 4, 1826. There, John Reish, five days before his death, when suffering from his last illness, conveyed all his estate, real and personal, to his brother Isaac for the recited consideration of $1, and, at the same time, Isaac gave to John a bond conditioned for the payment to John of the income of said property. The Supreme Court affirmed the judgment entered on a verdict for the Commonwealth and said:

" 'The policy of the law will not permit the owner of an estate to defeat the plain provisions of the collateral inheritance law by any device which secures to him for life the income, profits and enjoyment thereof; it must be by such a conveyance as parts with the possession, the title and the enjoyment in the grantor's lifetime.'

"In Seibert's Appeal, 110 Pa. 329, James Bradley made his will Dec. 1, 1881, bequeathing his estate to certain relatives and for certain religious

purposes, appointing John Bradley and George M. Seibert executors. On Aug. 14, 1882, the testator by deed assigned to his said executors securities worth about $50,000 in trust for themselves during the life of the testator and at his death to hold the same for the uses and purposes of his will. The Supreme Court unavoidably held that the transfer of the property was not to take effect in enjoyment until after the death of the grantor and so was liable for the tax.

"In Du Bois's Appeal, 121 Pa. 368, the intent to evade the statute was apparent from the terms of the deed and the Supreme Court, following the above two cases, said it was simply impossible that the deed could take effect in enjoyment as to any of the property embraced therein during the life of the grantor.

"Lines's Estate, 155 Pa. 378, is fully referred to by the Supreme Court in Spangler's Estate and need not be here further quoted. It was manifestly a case where the grantor retained the beneficial enjoyment as long as he lived."

The request for an issue was accordingly refused, the appeals were sustained, and the record was remitted to the Register of Wills.

*William M. Boenning, Robert M. Boyle, John Robert Jones* and *H. Horace Dawson,* for exceptant.

*Theodore S. Paul, Thomas Stokes* and *George Wharton Pepper,* for Mary B. Warburton and Elizabeth W. MacLeod, contra.

*Owen J. Roberts* (of *Roberts & Montgomery*), *Maurice Bower Saul* and *R. M. Remick,* for Rodman Wanamaker, contra.

HENDERSON, J., Dec. 31, 1926.—John Wanamaker died on Dec. 12, 1922, having on Dec. 14, 1920, assigned to his son Rodman the entire capital stock of the corporation known as John Wanamaker Philadelphia, appraised for transfer inheritance tax purposes at $30,000,000, and having on the same date assigned to a trustee for his two daughters $1,000,000 in preferred stock of this corporation.

The tax having been assessed, an appeal was taken, and thereafter in an adjudication the appeal was sustained and the action of the appraiser for the Commonwealth in assessing the tax reversed. The exceptions challenge this action of the presiding judge.

The position of the Commonwealth may be stated in the language of the brief of its counsel:

1. Did John Wanamaker absolutely and without reservation transfer the title, possession and enjoyment of the shares of common and preferred stock of John Wanamaker Philadelphia in his lifetime?

2. Do the facts and circumstances of the transfer show that the donor's condition was such that he might reasonably have expected death at any time?

3. Was the disposition of the property such as the donor contemplated making in the event of death, or was the disposition of the property such as he might reasonably be supposed to have desired to be made at his death?

4. Was there any moving cause for making the transfer at the time such transfer was made other than the fact that the donor's condition was such that he might reasonably expect death at any moment?

5. Upon a review of the entire evidence, is there a substantial dispute of fact as to whether or not John Wanamaker parted with the title, possession and enjoyment of the shares of stock in his lifetime? And

6. Should the Orphans' Court direct an issue to the Court of Common Pleas for a trial of facts by a jury?

Wanamaker's Estate.

Before proceeding to a consideration of the law involved, we will briefly answer these queries.

1. John Wanamaker did absolutely and without reservation transfer the shares of stock in this corporation in his lifetime. The presiding judge has found that these transfers were fully consummated by conveyance of title and that absolute and exclusive possession of the shares was taken by the respective assignees. We find no evidence to the contrary.

2. At the time the transfers were made John Wanamaker had no reason to expect impending death. There is ample evidence to support this finding and no evidence upon which a finding to the contrary could be based.

3. While there is no direct evidence that the disposition of these shares of stock was such as he might reasonably be supposed to have desired to be made at his death, nevertheless, the drawing of such an inference would probably be in keeping with his real intent. These transfers were not made in contemplation of death specially, but were possibly made in contemplation of death generally. There is no evidence upon which a finding could be based that the transfers were made in contemplation of death specially.

4. We have found that John Wanamaker was not in immediate contemplation of death, and there is no evidence that would warrant a finding that he thought his death was impending; the origin of the moving cause of the transfers was the reorganization of his business affairs so as to solidify his credit resources, and as a further moving cause it might be said that the disposition of this property was in contemplation of death generally.

5. The question—upon a review of the entire evidence—is there a substantial dispute of fact as to whether the decedent parted with the title, possession and enjoyment of these stocks in his lifetime, has practically been eliminated by the findings of the presiding judge upon sufficient evidence; and this finding will not be disturbed in the absence of clear error.

6. We do not know of any authority under which, under any state of facts, an issue to the Court of Common Pleas may be demanded as of right in tax appeals. This question will be further elaborated in our discussion of the law relating to this case.

The argument for the Commonwealth appears, as was stated by the presiding judge, to rest upon inference and innuendo. It is argued that Mr. Wanamaker would not have been likely to give away most of his fortune without some understanding with his son Rodman for his protection in case Rodman predeceased him, and that a secret trust must have been entered into. If such an agreement existed, the fund would undoubtedly be taxable, but there is not a scintilla of testimony to this effect.

It is contended that there were instances in the management of the various Wanamaker corporations when stock certificates were made out as evidence of transfers and thereafter canceled because of non-delivery, or for some other reason, and at least there was opportunity here for some such manipulation, and that the appellants had been permitted to put two witnesses back on the stand to correct their testimony. It has been ruled many times that opportunity is not evidence, and conjecture and suspicion do not take the place of testimony; furthermore, the transfer of these shares, both common and preferred, was completed on the books of the corporation, and the receipt for the new certificate duly signed by Rodman Wanamaker on the stub of the certificate book bearing even date with that of the transfer.

Permission for the witnesses to correct their testimony was well within the discretion of Presiding Judge Gest; and their credibility, he having seen and heard them, was peculiarly for him to judge.

### Wanamaker's Estate.

The position of the Commonwealth is two-fold:

1. That the tax is due if Wanamaker made the transfers with the shadow of death upon him; that is, in special contemplation of death. This argument may be dismissed because there is no evidence that such was the case, and because the findings of Judge Gest *contra* are clear and satisfactory, as is also his interpretation of the meaning of the phrase "in contemplation of death."

2. That the tax is due because the transfers were made in contemplation of death generally, and were such as he might reasonably be supposed to have desired to be made at his death.

This latter question must be resolved by an examination of the Act of June 20, 1919, P. L. 521, and the decisions of our Supreme Court. The title of this act is: "Providing for the imposition and collection of certain taxes upon the transfer of property passing from a decedent who was a resident of this Commonwealth at the time of his death, and of property within this Commonwealth of a decedent who was a non-resident of the Commonwealth at the time of his death. . . ."

This question arises under section 1(c), whereunder the tax is imposed: "When the transfer is of property, made by a resident . . . by deed, grant, bargain, sale or gift, made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death."

In Spangler's Estate, 281 Pa. 118, Mr. Justice Simpson, speaking for our Supreme Court, held that absolute and unconditional gifts were not within the purview of this act, saying: ". . . a *bona fide* and unconditional transfer by deed or gift, which has been fully consummated by conveyance of the title, and absolute and exclusive possession of the property taken by the transferee, is not within the purview of the statute," because it is not " 'to take effect in possession or enjoyment at or after such death.' "

This would seem to rule the instant case as one of an absolute gift, but the Commonwealth contends that it does not apply because the gifts which are the subject of these appeals were such a final disposition of the bulk of his estate as he might have made by will. It is argued that he was eighty-three and by common knowledge was approaching the end of his life's span, and even though the shadow of death was not upon him, nevertheless, his years were numbered. This situation was present in Spangler's Estate, 281 Pa. 118, wherein the decedent, although in usual health, was over one hundred years of age when he made absolute gifts to his family, and it was held they were not taxable.

The title of this act limits it to property passing from a decedent at the time of his death, and the body of the act may be no broader. Assuming the gift to be absolute and not made with death impending, the question of age has no bearing on the taxability of the gift. Gifts should be encouraged, not discouraged by taxation, and most legislatures would be loath to tax them. Wanamaker was well within his rights in making the gifts complained of herein.

In its answers the Commonwealth prays for a præcept to the Court of Common Pleas in order that a jury may pass on issues of fact. While we agree with the presiding judge that there are no facts in dispute, nevertheless, it should be pointed out that there is no practice warranting the award of an issue as of right in tax appeals. The learned counsel for the Commonwealth contend for this right under section 21(b) of the Act of June 7, 1917,

Wanamaker's Estate.

P. L. 363, which provides: "Whenever a dispute upon a matter of fact arises before any Orphans' Court, on appeal from any register of wills, or on removal from any register of wills by certification, the said court shall, at the request of either party, direct a præcept for an issue to the Court of Common Pleas of the county for the trial thereof, which, in the case of an issue *devisavit vel non*, shall be substantially in the following form: . . . Where the issue directed is other than an issue *devisavit vel non*, the foregoing form shall be changed, so far as necessary, in accordance with the circumstances of the case."

It is argued that the last clause comprehends appeals in other matters than issues *devisavit vel non*. This is true, as, for instance, an issue as to domicile: See Price v. Price, 156 Pa. 617.

In our opinion, this act does not apply to tax appeals, because they are not appeals from any act of the register. He is merely the agent of the Commonwealth which imposes the tax. By article II, section 10, of the Act of June 20, 1919, P. L. 521, it is provided: "The register of wills of the county in which letters testamentary or of administration are granted upon the estate of any person dying seized or possessed of property while a resident of the Commonwealth shall appoint an appraiser, whenever occasion may require, to appraise the value of the property or estate of which such decedent died seized or possessed and hereinbefore subjected to tax. Such appraiser shall make a fair, conscionable appraisement of such estate, and assess and fix the cash value of all annuities and life estates growing out of said estate, upon which annuities and life estates the tax imposed by this act shall be immediately payable out of the estate at the rate of such valuation."

Section 21 of the same article appoints the register the agent of the Commonwealth for the collection of these taxes.

An examination of the record will disclose the part played by the register. On page 7a will be found his order appointing the appraiser. The appraisement is not made by the register, but by the appraiser. On page 22a the docket of the register shows this entry: "1926, May 20—Inheritance tax appraisement filed in the sum of $811,475.71."

Thus it is seen the register performs no function other than as agent of and on behalf of the Commonwealth to appoint the appraiser. This agency is recognized by Mr. Justice Sadler in Leach's Estate, 282 Pa. 545, 547, when he says: "The Commonwealth seeks to recover collateral inheritance tax from the estate of J. Granville Leach based on an appraisement *made* (or rather caused to be made) *on its behalf by the Register of Wills*. . . ."

The right of appeal to this court in tax appraisements is given by section 13 of this act, which is as follows: "Any person not satisfied with any appraisement of the property of a resident decedent may appeal, within thirty days, to the Orphans' Court, on paying or giving security to pay all costs, together with whatever tax shall be fixed by the court. Upon such appeal, the court may determine all questions of valuation and of the liability of the appraised estate for such tax, subject to the right of appeal to the Supreme or Superior Court."

In Warden's Estate, 25 Dist. R. 1000, holding that the Commonwealth could not appeal from the appraisement for inheritance tax, Judge Copeland said: "This case is indicative of the fact that the assessment of collateral inheritance tax is the act of the Commonwealth, and that the legal representatives or parties in interest have no right to be present or to appear before the Commonwealth's assessor. . . . The State is generally presumed to be

satisfied by the acts of her own officers or appointees, and in very few cases is an appeal given from their action."

Rittenhouse's Estate, 36 Montg. Co. Law Repr. 89, is to the same effect. Therein Judge Miller said: "The appraiser, who was appointed by the Register of Wills to fix the values of the estate subject to the tax, was, in effect, the representative of the Commonwealth, and it follows that the net result of its appeal is, therefore, to complain of its own act."

We have reached the conclusion that tax appeals to this court are not governed by section 21(b) of the Act of June 7, 1917, P. L. 363, because they are not appeals from any action of the Register of Wills, but from an appraisement made by an appraiser who is the agent of the Commonwealth. The right to such appeals is given and they are regulated by section 13 of the Act of June 20, 1919, P. L. 521.

The exceptions are all dismissed, the decree of the presiding judge is confirmed absolutely and the record is remitted to the register.